*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C. J. GRIFFIN, Minor.

UNPUBLISHED
August 20, 2025
1:53 PM

No. 374566
St. Clair Circuit Court
Juvenile Division
LC No. 22-000046-NA

Before: BORRELLO, P.J., and M. J. KELLY and TREBILCOCK, JJ.

PER CURIAM.

Respondent appeals as of right the order terminating his parental rights to CJG under MCL 712A.19b(3)(c)(*i*) and MCL 712A.19b(3)(j). We affirm for the reasons stated in this opinion.

## I. BASIC FACTS

CJG was removed from his mother's care in February 2022 as a result of neglect and abuse. See *In re Griffin Minors*, unpublished per curiam opinion of the Court of Appeals, issued January 11, 2024 (Docket Nos. 366237 and 366238), p 2. Although respondent had a criminal history, the trial court concluded that placing CJG with respondent was not contrary to CJG's welfare. Two of respondent's other children also lived in the home.

For approximately one year there were no concerns with CJG's placement. However, in February 2023, Child Protective Services (CPS) received a complaint that CJG had head lice and that there were bed bugs in the respondent's home. Respondent admitted that CJG had been treated for head lice. However, a home visit was conducted, which revealed that there was feces on the porch and that paint had been spilled on the carpet. Respondent stated that the house was normally not in that condition and that it just needed to be cleaned.

One month later, CPS received another complaint regarding the home conditions. The condition of the house and the children was described as follows:

> The mice can be seen running through the home during the daytime. There is concern about mice feces around the home and the disease[s] mice carry. The

carpet has various things smushed into it. There is food and other substances on the floors. The dogs urinate and defecate on the porch. Footprints are in the feces. Feces is carried into the home and floors where the children play. The main toilet is in disrepair. It does not flush. The family uses a plunger to push urine/feces into the pipes. The furnace is in disrepair. There is concern the furnace is a fire hazard. The home is heated. The front door does not touch the floor. There is a big gap between the floor and door. The children's hygiene needs are not met. They are visibly grimy. There is food on their faces and in their hair. Their clothing is stained. It is unknown if the children are teased by peers.

Following a home visit, CPS found that the home was in "deplorable" condition, "covered in trash, dirty diapers, dirty dishes, old food, and other miscellaneous items." CJG was visibly "filthy," and was "temporarily safety planned out of the home."[1]

CJG was returned after respondent began working with Orkin and Families First. He "made a lot of progress cleaning the home." Thereafter, CJG appeared to be doing well and was happy and bonded with respondent. Respondent completed a life skills class and an anger management class. He also reported that he "corrected all the issues" regarding his home. At an unannounced home visit, respondent's home "was observed to be significantly cleaner than it had been at prior visits."

In July 2023, CPS received allegations regarding domestic violence involving respondent and his live-in girlfriend. When respondent's girlfriend attempted to leave the home with CJG and his half-siblings, respondent reached inside the vehicle, activated the emergency brake, and choked her with a seatbelt. The children cried and screamed during the assault, and the girlfriend was able to escape with the children. Respondent, however, followed them to a store and threatened to kill his girlfriend if she tried to take the children from him. He took her car keys and threw them in a ditch. The children were "visibly upset," with one having an "accident" and vomiting.

CPS re-visited the home and found that it was once again "extremely filthy" and "covered in trash, dirty dishes, old food, and miscellaneous items." As before, the children had "dirty clothes, dirty faces, dirty hands, and dirty feet." One of his children had an unexplained black eye. Respondent's other children reported "being fearful" of respondent. They recounted that respondent would yell and scream "bad words" at his girlfriend. Further, the children reported that when respondent was choking his girlfriend with a seatbelt they got out of the vehicle and tried to push it so that they could get away. All of the children recalled that respondent chased after them on his motorcycle when they finally got away.

A safety plan was implemented in which the girlfriend and children, except for CJG, left the home with respondent agreeing to have no contact with them. But respondent violated that agreement less than 24 hours later. He was arrested for domestic violence a few weeks later after he grabbed and choked his girlfriend.

---

[1] The other children were also removed. Respondent's parental rights to them were terminated in a separate child protective proceeding.

Petitioner filed an emergency supplemental petition, alleging "deplorable conditions" and ongoing domestic violence concerns, and requesting the trial court remove CJG from the home. At the emergency removal hearing, respondent explained his furnace was fully operational and while his main toilet did not work, the other toilet was fully functional. Respondent asserted the mice issue was "more or less gone," with a monthly extermination service ongoing, and denied chasing his girlfriend and the children on his motorcycle. The trial court, however, placed CJG in a nonrelative foster home. Respondent was given a Parent Agency Treatment Plan (PATP) and urged to comply with it.

Respondent was jailed in September 2023, and completed a domestic violence course, a substance abuse course, a parenting education class, and a life skills class while incarcerated. He was released from jail in February 2024, and gained employment. However, respondent did not show up for his Community Mental Health (CMH) intake appointment after his release. He missed two more intake appointments before finally completing it on his fourth appointment. Moreover, the record reflects that he was renting a three-bedroom home, but that it was empty save for respondent's bed and belongings. He was offered assistance in obtaining home furnishings.

At the July 2024 permanency planning hearing, it was reported that respondent was paying rent but delinquent on utility bills. Respondent had a total shut off on April 30, 2024, and did not respond to an inquiry regarding his need to pay a $395 deposit for his water to be turned back on. Although respondent interacted with CJG at parenting time, brought him food, and occasionally brought activities, the child's guardian ad litem (GAL) opined that respondent had not improved, considering the amount of time CJG had been in care. Respondent was inconsistent and cutting parenting time short, and he was not following through with mental health services. Additionally, respondent had removed himself from the anger management waiting list, missed almost half of his CMH appointments, and was closed out of another assistance program for noncompliance. Ultimately, given the lack of progress, petitioner filed a supplemental petition seeking termination of respondent's parental rights to CJG.

Following a termination hearing, the trial court found statutory grounds to terminate respondent's parental rights to CJG and found that it was in the child's best interests. This appeal follows.

## II. STATUTORY GROUNDS

### A. STANDARD OF REVIEW

Respondent argues that the trial court clearly erred by finding statutory grounds for termination existed. This Court reviews "for clear error the trial court's factual finding that there are statutory grounds for termination of a respondent's parental rights." *In re Atchley*, 341 Mich App 332, 343; 990 NW2d 685 (2022). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Miller*, 347 Mich App 420, 425; 15 NW3d 287 (2023) (citation omitted).

## B. ANALYSIS

Termination of parental rights is warranted under MCL 712A.19b(3)(c)(*i*) if there is clear and convincing evidence that:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . .:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

In this case, the trial court took jurisdiction of the children and ordered respondent to participate in services on March 10, 2022. The termination order was entered on December 31, 2024, which was more than 182 days since the initial disposition. The conditions that led to adjudication were respondent's domestic violence issues along with the deplorable condition of his home. These issues were not resolved during the proceedings.

The record reflects that respondent was able to find housing, but that he did not have any furniture, food, or other necessities to take care of CJG. Although he was provided with a referral for a program that could have helped him obtain such necessities, he was closed out of that program for noncompliance. There was also evidence that respondent had not rectified the conditions related to his domestic-violence issues. He had completed an anger management class while incarcerated, but he still reported a desire to fight people. Moreover, although he was offered mental-health services aimed at rectifying that issue, the record reflects that he was not regularly taking medication to help stabilize his emotions. Termination is proper under (c)(*i*) when "the totality of the evidence amply support[ed] that [the respondent] had not accomplished any meaningful change in the conditions" that led to adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). Given the record in this case, the trial court did not clearly err in making that finding.

Finally, the record also supports that respondent would be unable to rectify this issue within a reasonable time considering CJG's age. CJG was in care for almost three years when respondent's parental rights were terminated. Nothing in the record supports respondent being able to properly care for CJG within a reasonable time considering the amount of time respondent has already had to rectify the conditions leading to CJG's removal. Respondent was fully aware of what was required of him, but still removed himself from the list for anger management, and abandoned a home with furnishings for no reason beyond a lack of storage. The record supports the conditions that led to the adjudication continued to exist and there was no reasonable likelihood that respondent would rectify them within a reasonable time. See MCL 712A.19b(3)(c)(*i*).

-4-

For the foregoing reasons, the trial court did not clearly err by finding that termination of respondent's parental rights to CJG was warranted under MCL 712A.19b(3)(c)(*i*).[2]

III. BEST INTERESTS

A. STANDARD OF REVIEW

Respondent next argues that it was not in CJG's best interests for his parental rights to CJG to be terminated. We review a trial court's best-interests determination for clear error. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

B. ANALYSIS

"The trial court must order the parent's rights terminated if the Department has established a statutory ground for termination by clear and convincing evidence and it finds from a preponderance of the evidence on the whole record that termination is in the child[]'s best interests." *In re White*, 303 Mich App at 713. "The trial court should weigh all the evidence available to determine the child[]'s best interests." *Id*. At this stage in the proceeding, the focus is on the child, not the parent. *In re Atchley*, 341 Mich App at 346. When determining best interests, the court can consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App at 713 (quotation marks and citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child[]'s well-being while in care, and the possibility of adoption." *Id*. at 714.

CJG and respondent have a strong bond. However, that is only one factor that the court may consider. Respondent attended a large majority of parenting time and was engaged with CJG, but there were concerns respondent could not effectively parent all of his children when together. Further, respondent did not benefit from his domestic violence class, failed to comply with his service plan, and has yet to provide stable and suitable housing for CJG. In the meantime, the child has spent almost three years of his life in care. Considering CJG's need for permanence, stability, and finality, we conclude that the trial court did not clearly err in determining the termination of respondent's parental rights was in CJG's best interests.

Affirmed.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ Christopher M. Trebilcock

---

[2] Because termination was proper under (c)(*i*), we need not specifically consider the additional grounds upon which the trial court based its decision. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009) (noting DHHS need only establish one statutory ground for termination).